NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DENISE S. KERDMAN,<br><br>                Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN,<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                Defendant. | Civil Action No. 13-04216 (SDW)<br><br><br>**OPINION**<br><br><br>**July 30 , 2014** |

**WIGENTON,** District Judge.

Before this Court is Plaintiff Denise S. Kerdman's ("Kerdman") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Donna A. Krappa's ("ALJ Krappa") denial of Kerdman's claim for Social Security Disability Insurance Benefits ("SSDI") and Supplemental Security Income ("SSI").  This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper under 28 U.S.C. § 1391(b).  For the reasons stated herein, this Court **AFFIRMS** ALJ Krappa's decision.

I.      FACTUAL AND PROCEDURAL HISTORY

    A.      **Factual Background**

### 1.     Personal and Employment History

Kerdman is a 43 year old woman who lives with her mother in Belleville, New Jersey. (R 38-39.) Kerdman is 5'1" tall and weighs 238lbs. (R. 40.) She is single, has no children, and has no driver's license. (R. 38-39.) Kerdman graduated from high school in 1988 and began work as a teacher's aide in a day care in 1999 but was forced to stop working in March 2009 due to a serious anxiety attack. (R. 41-42.) She tried to return to work but was unable to do so because of her various medical conditions. (R. 42-43, 62-63.)

### 2.     Medical History

Kerdman maintains that she suffers from a multitude of physical ailments, including: obesity, diabetes, diabetic neuropathy, autonomic neuropathy, hypertension, stroke, congestive heart failure, edema, retinal hemorrhage in her right eye, some hearing loss, osteoarthritis, carpal tunnel syndrome, radiculopathy, broad-based posterior disc herniation, blurred vision, swelling in the ankles and feet, and joint disease with fluid in two joints. (Plaintiff's Brief 6 (hereinafter, "Pl.'s Br.").) Kerdman also suffers from mental ailments, including anxiety and depression. (*Id*.) Kerdman testified that she experiences anxiety attacks daily. (R. 50.) She stated that the anxiety attacks can last up to a half hour and can cause her to experience rapid breathing, palpitations, and shaking. (R. 46-47.) Kerdman testified that she has been prescribed Xanax for the anxiety attacks, which she is supposed to take every six hours. (R. 47.) She also testified that she is insulin dependent and tests her blood glucose levels daily to combat her diabetes, which she was diagnosed with in 2005. (R. 44-45.) She explained that she often feels a numb, tingly sensation as a result of her diabetes. (R. 44.) Kerdman also stated that her diabetes, at times, causes her to experience blurry vision and dizziness. (R. 45.)

Furthermore, Kerdman testified that she has problems with her hands and legs. (R. 20, 43-46.) She stated that as a result, she uses a cane or walker to help her get around, which she had used for about three years at the time of the administrative hearing. (R. 51-52.) She testified that she cannot stand for fifteen minutes at a time, nor can she sit for more than half an hour at a time. (R. 54.) Kerdman testified that she has trouble walking a single block because her "legs weaken pretty fast . . . and tire out." (R. 53.) Further, Kerdman explained that when she goes from sitting to standing, she often has to lay down on her side to transition between poses. (R. 54; Pl.'s Br. 7.) She also claims that she cannot lift a gallon of milk because she "feel[s] a pull . . . in [her] arms and [] back." (R. 54.) She testified that she wears a brace on each hand because her skin is sensitive and because, at the time of the hearing, she had recently found out that she had arthritis. (R. 54-55.) Kerdman testified that she has trouble sleeping, testifying that she is "lucky if [she] can sleep two [hours] a night," and that she is physically unable to make her bed. (R. 56.)

Additionally, Kerdman testified that to combat her back problems, she participated in physical therapy and received medical injections. (R. 52.) Kerdman also testified that she has a hard time dealing with people and sometimes gets overly depressed. (R. 43-44.)

Kerdman began seeing Dr. Oleg Frank as her primary care physician in 2005. (R. 252.) Dr. Frank treated her for several years and diagnosed her with numerous medical conditions, including asthma, uncontrolled diabetes, diabetic neuropathy, dizziness, anxiety attacks, severe numbness in her hands and feet, autonomic neuropathy, gastroparesis, depression, hearing loss, high blood pressure, high cholesterol, chronic back pain, and radiculopathy. (R. 492-94, 507-08, 510-11.) He therefore opined that Kerdman's medical conditions "render her disabled, unable to perform activities of daily living without assistance and unable to work or provide for herself." (*Id.*)

3

Kerdman's hospital records are extensive. She was admitted to St. Michael's Medical Center on numerous occasions for various conditions, including stints from March 26 through April 1, 2008; July 2, 2008; March 31 to April 4, 2009; and April 7, 2009 to April 10. (R. 313-20, 321-36, 351-68, 369-402.) The record also reveals that Kerdman visited Mount Prospect Primary Care Center on an outpatient basis multiple times from May 5, 2005 to July 31, 2009. (R. 403-46.)

On September 17, 2009, Kerdman was referred by the Disability Determination Services for an internal medicine examination. (R. 21.) She was examined by Dr. Rahel Eyassu, M.D., who diagnosed Kerdman with diabetes mellitus type 1, diabetic neuropathy, chronic dizziness, hypertension, chronic low back pain, asthma, anxiety, and depression. (R. 447-51.) On that same day, Kerdman underwent a mental consultative examination at the request of the Disability Determination Services. (R. 21.) Dr. Alec Roy, M.D. conducted the examination and diagnosed Kerdman with a panic disorder but also stated that her thinking process was normal, that she was well-oriented, not depressed, and that she did not show signs of memory loss, paranoia, delusions, or hallucinations. (R. 459-61.)

## II. PROCEDURAL HISTORY

On June 30, 2009[1], Kerdman filed a Title II application for SSDI and a Title XVI application for SSI, with an alleged disability onset date March 30, 2009. (R. 230-39, 246-57.) Both of these claims were initially denied on November 19, 2009, and again upon reconsideration on May 26, 2010. (R. 106-11, 116-21.) Subsequently, on July 15, 2010, Kerdman filed a written request for an administrative hearing. (R. 122.) The Social Security Administration ("SSA") granted Kerdman's request and the initial hearing proceeded before ALJ Krappa on August 18,

---

[1] ALJ Krappa's decision indicates that Kerdman filed SSDI application on April 14, 2009; however, it appears that the application was filed on June 30, 2009.

4

2011.  (R. 13, 138-201.)  ALJ Krappa heard the testimony of Kerdman and medical expert Dr. Martin Fechner, M.D. at the initial hearing.  (R. 31-77.)  Thereafter, ALJ Krappa scheduled a supplemental hearing to admit records of Kerdman's carpal tunnel disorder and mental health treatment and to determine whether Kerdman used an assistive device during an internal medicine consultative examination.  (*Id*.)  On October 12, 2011, Kerdman, along with Dr. Fechner and a vocational expert, appeared and testified at the supplemental hearing.  (R. 78-101.)  ALJ Krappa issued a decision (the "Decision") denying Kerdman's SSI and SSDI claims on November 28, 2011.  (R. 10-25.)  Kerdman then applied to the Appeals Council, which denied her request on May 17, 2013.  (R. 1-3.)  On July 10, 2013, Kerdman commenced this action in the United States District Court for the District of New Jersey.  (Dkt. No. 1.)

## II.     LEGAL STANDARD

In social security appeals, district courts have plenary review of the legal issues decided by ALJs.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  The court's review of the ALJ's factual findings, however, is limited to determining whether there is substantial evidence to support those conclusions.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'"  *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).  However, if

the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz*, 244 F. App'x. at 479 (citing *Hartranft*, 181 F.3d at 360)). The court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D.Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

### III. DISCUSSION

#### A. SSDI Test

An individual will be considered disabled under the Social Security Act (the "Act") if he or she is unable to "engage in any substantial gainful activity [("SGA")] by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42

6

U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be severe enough to render the individual "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).  A claimant must show that the "medical signs and findings" related to his or her ailment have been "established by medically accepted clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ."  *Id*.

In order to establish a prima facie case of disability under the Act, a claimant bears the burden of demonstrating: (1) that she was unable to engage in SGA by reason of physical or mental impairment that could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment was demonstrated by evidence supported by medically acceptable clinical and laboratory techniques.  *See* 42 U.S.C. § 1382c (a)(3).

In determining disability, the Social Security Administration ("SSA") utilizes a five-step sequential analysis.  *See* 20 C.F.R. § 416.920; *see also Cruz*, 244 F. App'x. at 479.  A determination of non-disability at steps one, two, four, or five in the five-step analysis ends the inquiry.  20 C.F.R. § 416.920.  A determination of disability at steps three and five results in a finding of disability. *Id.*  If an affirmative answer is determined at steps one, two, or four, the SSA proceeds to the next step in the analysis.  *See id.*

At step one, the Commissioner must determine whether the claimant is engaging in SGA. *See* 20 C.F.R. § 416.920(a)(4)(i).  SGA is defined as work activity that is significant and done for payment.  20 C.F.R. § 416.910.  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 416.972(a).  "Gainful work activity" is work

7

that is usually done for profit, whether or not profit is realized.  20 C.F.R. § 416.972(b).  If an individual engages in SGA, he is not disabled regardless of the severity of his physical or mental impairments.  20 C.F.R. § 416.920(a)(4)(i).  If the individual is not engaging in SGA, the Commissioner proceeds to the next step. 20 C.F.R. § 416.920.

At step two, the Commissioner must determine whether the claimant has a medically determinable severe impairment or a combination of severe impairments.  20 C.F.R. § 416.920(c).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  *See id.*  An impairment or combination of impairments is "not severe" when medical and other evidence establishes only a slight abnormality or combination of abnormalities that would have a minimal effect on an individual's ability to work.  20 C.F.R.  § 416.921.  If the claimant does not have a severe impairment or severe combination of impairments, he is not disabled.  20 C.F.R. § 416.920(c).  If the claimant does have a severe impairment or severe combination of impairments, the analysis proceeds to the third step.  20 C.F.R. § 416.920.

At step three, the Commissioner must determine whether the claimant's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.920(d), 416.925, 416.926.  If the claimant's impairment or combination of impairments meets the criteria of a listing and the duration requirement, the claimant is disabled.  20 C.F.R. § 416.920(d).  If the claimant's impairment or combination of impairments do not, the analysis proceeds to the next step.  20 C.F.R. § 416.920(e).

At step four, the Commissioner must determine whether the claimant has the residual function capacity ("RFC") to perform the requirements of his past relevant work.  20 C.F.R. § 416.920(f).  In making this determination, the Commissioner must consider all of the claimant's

impairments, including impairments that are not severe. 20 C.F.R. §§ 416.920(e), 416.945. "Past relevant work" means work performed within the fifteen years prior to the date that the disability must be established. 20 C.F.R. § 416.960(b)(1). If the claimant has the RFC to perform his past relevant work, the claimant is not disabled. 20 C.F.R. § 416.960(b)(3). If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth step. *See* 20 C.F.R. § 416.920(a)(4)(iv).

At step five, the Commissioner must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(g). The claimant bears the burden of persuasion in the first four steps. *See Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 763 (3d Cir. 2009). If the claimant establishes that his impairment prevents him from performing any of his past work, the burden shifts to the Commissioner at step five to determine whether the claimant is capable of performing an alternative SGA present in the national economy. *See* 20 C.F.R. § 416.920(g); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987).

### B. The ALJ's Reliance on the Medical Evidence of Record

In conducting the five-step sequential analysis, ALJ Krappa greatly credited Dr. Fechner's opinion but accorded little weight to Dr. Frank's opinion. (R. 22-23.) Kerdman contends that it was reversible error for Judge Krappa to have done so because Dr. Fechner's opinion is contrary to the evidence of record. (Pl.'s Br. 15-20.) Further, Kerdman argues that Dr. Frank's opinion is entitled to controlling weight because he was Kerdman's treating physician. (Pl.'s Br. 20-22.)

The Social Security Regulations describe the amount of weight an ALJ must give to the treating physician's opinion. *See* 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927. The opinion of a treating physician is generally entitled to great weight and enjoys controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

9

and is not inconsistent with the other substantial evidence" of record. 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). The regulations instruct the ALJ to consider several factors in determining whether to give the treating physician's opinion controlling weight, including whether the physician adequately explains the bases for his or her opinion, whether the opinion is consistent with the record as a whole, and any other relevant factors. 20 C.F.R. § 404.1527(c)(3), (4), (6); 20 C.F.R. § 416.927(c)(3), (4), (6). Indeed, the Third Circuit has cautioned as follows: "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)).

Kerdman's position that Dr. Frank's opinion deserves dispositive deference is unsupported by the record. Indeed, the Decision reflects that ALJ Krappa carefully considered Dr. Frank's opinion but gave it the appropriate amount of weight. (R. 22-23.) For instance, in a document entitled "Work/School Excuse" dated April 17, 2009, Dr. Frank, after listing Kerdman's disorders, stated that she "may not be able to work due to these medical conditions." (R. 445.) Notably, this conclusion was unaccompanied by any explanation. And in letters dated February 16, 2010, May 27, 2011, and June 23, 2011, Dr. Frank summarizes Kerdman's various medical conditions and opines that "[t]hese conditions and their symptoms render her disabled, unable to perform activities of daily living without assistance and unable to work or provide for herself." (R. 492-93, 507-08, 510-11.) Other than summarily laying out Kerdman's conditions and their symptoms, Dr. Frank does not provide any supporting explanation for his opinion that she is unable to work or independently take care of her daily needs. Further, Dr. Frank's opinion that Kerdman cannot "perform the activities of daily living without assistance" is, to some extent, contradicted by

10

Kerdman's own testimony. Although she did testify to having some limitations in her daily activities, Kerdman testified that she could check her blood sugar levels and administer her own medication. (R. 56-57.) She also testified that she could prepare simple meals, feed herself, and do some dusting. (R. 57-58.) She stated that she spends her days visiting with friends and family, talking on the telephone, and occasionally using the computer. (R. 58-59.)

Moreover, Dr. Frank's opinion is inconsistent with the medical evidence of record. Dr. Rahel Eyassu, M.D. conducted a consultative medical examination of Kerdman on September 17, 2009. (R. 447-51.) During the examination, Kerdman informed Dr. Eyassu that she helped with the cooking, cleaning, and weekly shopping. (R. 448.) She also told Dr. Eyassu that she dresses and showers herself and enjoys watching television, listening to the radio, reading, and socializing with friends. (R. 448.) Dr. Eyassu observed that Kerdman did not require assistance with changing herself for the examination or getting on or off the examination table. (R. 449.) Dr. Eyassu concluded that Kerdman should avoid heights, driving, heavy machinery, and respiratory irritants, including dust and fumes. (R. 451.) Dr. Eyassu opined that Kerdman could do minimal bending but needed to avoid heavy lifting. (*Id*.) As such, Dr. Eyassu's findings contradict Dr. Frank's opinion that Kerdman was completely disabled and could not work. It should also be noted that two state agency medical consultants reviewed Kerdman's medical records and determined that she could perform light exertional work with specified limitations, which also contradicts Dr. Frank's opinion of complete disability. (R. 462-69, 495.)

Additionally, ALJ Krappa explained that she "gave little weight to the opinion of Dr. Frank as expressed in the disability statement [because] he prepared [it] for [Kerdman] for purposes of continuing her welfare benefits." (R. 23.) Much of the medical source statements of Dr. Frank are derived from documents that were completed for Kerdman to obtain state benefits. (R. 445,

11

492-94, 501-08, 510-11.)  As such, ALJ Krappa properly considered Dr. Frank's sympathetic bias, because as Kerdman's treating physician, he may have wanted to help her obtain benefits.  Thus, ALJ Krappa was justified in weighing Dr. Frank's opinion accordingly.  Finally, in numerous instances Dr. Frank opined that Kerdman was "disabled" and unable to work.  The Social Security Regulations are clear that the ALJ alone, not treating or examining physicians, is qualified to make the disability determination.  *See* 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.")  As such, ALJ Krappa correctly disregarded Dr. Frank's "disabled" conclusion, and substantial evidence supports her decision not to treat Dr. Frank's opinion as controlling.

Likewise, Kerdman's contention that Dr. Fechner's opinion is contrary to the evidence of record is unpersuasive.  While according little weight to Dr. Frank's opinion, the ALJ gave substantial weight to Dr. Fechner's opinion.  (R. 22-23.)  Although Dr. Fechner never physically examined Kerdman, he considered all of the relevant medical evidence and relied upon his own training and experience when conducting his evaluation.  (R. 65-66.)  His analysis is not only consistent with the record, but it is consistent with the medical reports made by consultative examiners Rahel Eyassu, M.D. and Alec Roy, M.D.  For example, Dr. Fechner opined that Kerdman was capable of performing sedentary work with the ability to lift no more than ten (10) pounds occasionally, occasional bending and crouching, and no use of ladders, scaffolding, crawl spaces or "anything like that." (R. 68.)  He also testified that she could not be in environments with extreme temperatures, excessive dust, or chemical irritants.  (*Id*.)  Dr. Eyassu opined that Kerdman should avoid heights, dust, fumes and known respiratory irritants.  (R. 451.)  She also

opined that Kerdman should avoid heaving lifting and only bend minimally. (*Id.*) Therefore, the evidence of record supports ALJ Krappa's decision to significantly credit Dr. Fechner's opinion.

While the record contains conflicting medical analysis with respect to the severity of Kerdman's impairments, ALJ Krappa properly assessed the differing opinions, explained why she accorded more weight to Dr. Fechner's opinion, and thus, the Decision is supported by substantial evidence. *Plummer*, 186 F.3d at 429 ("When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.") (citations omitted).

### C. The ALJ's Analysis of Kerdman's Mental Impairments

At the second step of the sequential analysis, the ALJ must determine whether the claimant has a "severe" medically determinable impairment or a combination of impairments that render the combined impairment "severe." 20 C.F.R. § 404.1520. ALJ Krappa determined at step two that Kerdman suffers from a combination of the following severe impairments: a disorder of the back, exogenous obesity, asthma, gastrointestinal disorder, and mild bilateral carpal tunnel syndrome. (R. 16). Kerdman argues that ALJ Krappa erred by failing to consider the severity of Kerdman's anxiety and depression at step two of the sequential analysis. (Pl.'s Br. 24.) Additionally, Kerdman contends that ALJ Krappa's analysis of her mental impairments is flawed because at step three, ALJ Krappa analyzed Kerdman's depression and anxiety under Listing 12.04 instead of analyzing the severity of her anxiety under Listing 12.06, which is the section that covers anxiety. (Pl.'s Br. 24-25.) Kerdman's arguments are unpersuasive.

As a threshold matter, it should be noted that when Kerdman applied for SSI and SSDI on June 30, 2009, she was not then under the care of a mental health professional, although she alleged

13

a disability onset date of March 30, 2009.  (R. 13, 459, 490.)  To be entitled to SSI or SSDI, the claimant's mental or physical impairment(s) must have lasted, or be expected to last, for a continuous period of at least twelve (12) months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Furthermore, Kerdman's disability is "based primarily upon a disorder of the back, exogenous obesity, asthma, gastrointestinal disorder, and mild bilateral carpal tunnel syndrome."  (R. 13.)

Nevertheless, ALJ Krappa conducted a detailed analysis of Kerdman's mental impairments at step three and found that they did not meet or medically equal the criteria of Listing 12.04.  (R. 18.)  In evaluating the "paragraph B" criteria, ALJ Krappa found Kerdman to have "moderate restriction" in daily living activities and "moderate difficulties" in both social functioning and with respect to concentration, persistence, or pace.  (*Id*.)  She also reviewed Kerdman's medical records and determined that Kerdman had "no episodes of decompensation."  (*Id*.)  Thus, Kerdman's mental impairments did not satisfy the "paragraph B" criteria.  Similarly, ALJ Krappa considered the "paragraph C" criteria and determined that the evidence of record showed the criteria were not satisfied.  (*Id*.)  Accordingly, to the extent ALJ Krappa erred at step two by not listing Kerdman's mental impairments as severe, any such error was harmless because ALJ Krappa considered these impairments, as well as their severity, in step three of the sequential analysis.  (R. 18-23.)  *See Frank-Digiovanni v. Colvin*, Civil Action No. 12-1605, 2014 U.S. Dist. LEXIS 70075 at *11-*12 (M.D. Pa. May 22, 2014) (finding that although the ALJ did not properly account for one of claimant's impairment in step two, the error was harmless because the ALJ accounted for the impairment within the opinion and clearly considered its impact on the disability determination); *Roberts v. Astrue*, Civil Action No. 08-cv-0625, 2009 U.S. Dist. LEXIS 91559 at *15 (W.D. Pa. Sept. 30, 2009) (stating "even assuming that the ALJ failed to include all of Plaintiff's severe

impairments at step two, this would be harmless error, as the ALJ did not make his disability determination at this step").

Likewise, Kerdman's argument that ALJ Krappa erred at step three by not considering her anxiety pursuant to Listing 12.06 is unavailing. Although Listing 12.04 does not expressly cover anxiety, the assessment criteria (i.e., paragraphs B and C criteria) under Listings 12.04 and 12.06 are the same. Both state that a claimant has the burden of establishing "marked" limitations in two of the following: activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; or repeated episodes of decompensation amounting to either three episodes within one year or, in the alternative, an average of once every four months, each lasting for at least two weeks. *See* 20 C.F.R. § 404, Subpart P, Appendix 1, 12.04B, 12.06B. As the analysis under Listing 12.04 or 12.06 is exactly the same, the ALJ's ultimate determination of Kerdman's mental impairments would be the same under either listing. Thus, Kerdman's contention that ALJ Krappa failed to analyze her anxiety under Listing 12.06 is an insufficient basis for reversal.

Furthermore, ALJ's Krappa's determinations are supported by the findings of the evaluating medical consultants. Indeed, her mental impairment conclusions are consistent with the determinations of Drs. Alec Roy, M.D., Benito Tan, M.D., Leslie Williams, Ph.D. and Ibrahim Housri, M.D. (R. 459-61, 474-90, 495, 497.) For example, Dr. Tan determined that Kerdman's daily living activities were moderately limited and that her social functioning and ability to maintain concentration, persistence, or pace were mildly limited; these are the same findings ALJ Krappa made. (R. 18, 484.) Therefore, ALJ Krappa properly analyzed Kerdman's mental impairments and her conclusions are supported by substantial evidence.

This Court has considered Kerdman's remaining arguments and finds them without merit.

## IV. CONCLUSION

For the foregoing reasons, this Court finds that substantial evidence supports ALJ Krappa's decision. Accordingly, this Court **AFFIRMS** the Decision

s/Susan D. Wigenton, U.S.D.J.

Orig: Clerk
Cc: Parties